**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 21-cv-03033-NYW-KAS

JAMES BOWLING, individually and on behalf of all others similarly situated,

     Plaintiff,

v.

DAVITA, INC.,

     Defendant.

---

## ORDER ON MOTION TO DECERTIFY

---

This matter is before the Court on DaVita Inc.'s Motion to Decertify Fair Labor Standards Act Conditional Collective (the "Motion" or "Motion to Decertify"). [Doc. 268]. The Court has reviewed the Motion and finds that oral argument would not assist in its resolution. For the following reasons, the Motion to Decertify is respectfully **GRANTED**.

## BACKGROUND

The Court has previously set out the factual background of this case in detail, *see* [Doc. 92], and repeats it here only as necessary to resolve the Motion to Decertify. Plaintiff James Bowling ("Plaintiff" or "Mr. Bowling") initiated this collective action under the Fair Labor Standards Act ("FLSA"), alleging that Defendant DaVita, Inc. ("Defendant" or "DaVita") failed to provide bona fide meal breaks to its employees and failed to adequately compensate its employees for time worked during their meal breaks. [Doc. 31 at ¶ 1]. More specifically, he alleges that DaVita—a health care provider that "employed thousands of nurses and technicians" during the relevant time period— automatically deducted 30 minutes from its employees' six-hour shifts to account for

unpaid 30-minute meal breaks, even though DaVita requires and expects its employees to work during those unpaid meal breaks.  [*Id.* at ¶¶ 18, 21–22, 25–29].  Plaintiff claims that this practice deprived DaVita nurses and technicians of overtime compensation to which they are entitled.  [*Id.* at ¶¶ 3, 10].

Mr. Bowling asserts a single FLSA claim based on a failure to pay proper overtime wages on behalf of a group of current and former DaVita nurses and technicians.  [*Id.* at ¶¶ 31–39].  In 2023, he moved for conditional certification of the following collective:

> All current and former hourly-paid nurses and technicians employed at any DaVita location to provide direct patient care who did not receive fully relieved meal breaks who may be owed overtime pay under the FLSA for workweeks in which they worked more than forty (40) hours per week including any deducted meal breaks.

[Doc. 73 at 19].[1]  The Court granted Plaintiff's request in part, permitting conditional certification but limiting the collective to nurses and technicians who worked at DaVita locations in Arkansas, Florida, Georgia, Louisiana, Oklahoma, New York, Tennessee, Texas, and Virginia during the relevant time period (the "FLSA Collective").  [Doc. 92 at 15].[2]  Approximately 1,300 people opted in to the FLSA Collective, *see* [Doc. 268 at 16; Doc. 277 at 14], and the Court will refer to those individuals as "Opt-In Plaintiffs."

The Parties have completed two phases of discovery, the second of which focused on "(1) the claims of those individuals who file consents to join the action under 29 U.S.C.

---

[1] When citing to the Parties' briefs, the Court cites to the page number assigned by the CM/ECF system rather than the page numbers assigned by the Parties.  When citing to transcripts, the Court cites to the page and line numbers appearing on the transcript.  In either case, the Court refers to the docket number assigned by the CM/ECF system.

[2] The Court rejected Plaintiff's request for conditional certification of a nationwide collective because "Plaintiff's and Opt-In Plaintiffs' knowledge [was] limited to their personal observations and experiences working for DaVita in nine specific states."  [Doc. 92 at 14–15].

§ 216(b), and (2) whether de-certification is warranted." [Doc. 42 at 7]. DaVita now moves to decertify the FLSA Collective. [Doc. 268].

## LEGAL STANDARDS

FLSA collective actions may be maintained "only by and among employees who are 'similarly situated.'" *Norwood v. WBS, Inc.*, No. 15-cv-00622-REB-STV, 2016 WL 7666525, at *1 (D. Colo. Sept. 29, 2016). The Tenth Circuit has endorsed a two-step process for determining whether employees are "similarly situated." *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001). At the first step, which this Court completed in 2023, the trial court determines whether the plaintiff has asserted "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 1102 (quoting *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D. Colo. 1997)). "Certification at this step is conditional, and the standard of proof 'is a lenient one that typically results in . . . certification,' allowing notice to be sent to the putative class members and discovery to be undertaken." *Norwood*, 2016 WL 7666525, at *1 (quoting *Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 679 (D. Kan. 2004)).

"At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of 'similarly situated.'" *Thiessen*, 267 F.3d at 1102–03 (quoting *Vaszlavik*, 175 F.R.D. at 678); *see also Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006) ("At the second stage, following discovery, trial courts examine more closely the question of whether particular members of the class are, in fact, similarly situated."). At this stage, the court considers evidence "to determine whether the assembled class may continue as a collective action or whether

3

the putative class should be decertified, leaving plaintiffs free to pursue their claims individually." *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 851 (N.D. Ohio 2013). Courts consider three primary factors in making this determination:  "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations."  *Thiessen*, 267 F.3d at 1103 (quotation omitted); *Brayman v. Keypoint Gov't Sols., Inc.*, No. 18-cv-00550-WJM-NRN, 2024 WL 1659594, at *5 (D. Colo. Apr. 17, 2024).  Courts do not, however, weigh in on the merits of the plaintiff's claims or resolve factual disputes.  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1148 (D. Minn. 2005); *Thiessen*, 267 F.3d at 1106–07 (concluding that the trial court erred by "effectively ma[king] findings regarding [factual disputes] in the guise of determining whether plaintiffs were 'similarly situated'").  The burden to show that collective members are similarly situated rests with the plaintiff.  *Green v. Perry's Rests. Ltd.*, No. 21-cv-00023-WJM-NRN, 2024 WL 5145948, at *1 (D. Colo. Dec. 17, 2024).

**ANALYSIS**

## I.    Opt-In Plaintiffs' Disparate Factual and Employment Settings

"A collective action is not appropriate when determining whether a plaintiff has a viable claim requires a detailed, fact-specific inquiry."  *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 346 (N.D. Ill. 2012).  In evaluating whether members of a collective are similarly situated, courts "typically consider such factors as location, job duties, supervision, and policies or practices that bind the plaintiffs' claims together."  *Id.* (collecting cases).  The Opt-In Plaintiffs need not be *identically* situated, and differences among the Opt-Ins do not require decertification so long as the differences are immaterial

4

and are "outweighed by the similarities between" them. *Levine v. Vitamin Cottage Nat. Food Markets, Inc.*, No. 20-cv-00261-STV, 2023 WL 3648684, at *5 (D. Colo. May 25, 2023) (quotation omitted).

The FLSA Collective consists of approximately 1,300 individuals, including registered nurses ("RNs") (479 Opt-Ins), licensed practical nurses ("LPNs") (10 Opt-Ins), and technicians (835 Opt-Ins). [Doc. 268-31 at ¶ 5].[3] The FLSA Collective members have worked under 820 different supervisors at 1,459 DaVita locations, including clinics (1,205 Opt-Ins), hospitals (122 Opt-Ins), "home program locations" (15 Opt-Ins), and skilled nursing facilities.[4] [*Id.* at ¶¶ 5–6]. Nearly two-thirds of the Collective have worked at more than one location, and one-fifth have worked at more than five locations. [*Id.* at ¶ 5]. The services provided by the members vary by location; at clinics, employees provide "chronic" dialysis services, and at hospitals, employees provide "acute" dialysis services. [*Id.*].

Because the claimed FLSA violations here arise from DaVita's alleged failure to provide its employees uninterrupted meal breaks, [Doc. 31 at ¶ 37], the Court focuses on that aspect of the FLSA Collective's employment circumstances. Although Plaintiff insists that DaVita employs a "companywide meal break policy and practice" that led to the FLSA violations claimed in this case, [Doc. 277 at 26], the Court respectfully concludes that Plaintiff has not met his burden to demonstrate the existence or enforcement of a uniform policy.

DaVita's Facility Administrators ("FAs"), who manage day-to-day facility

---

[3] Some Opt-In Plaintiffs "worked in more than one role." [Doc. 268-31 at ¶ 5].

[4] DaVita does not indicate how many Opt-Ins worked at skilled nursing facilities. [Doc. 268 at 22; Doc. 268-31 at ¶¶ 2, 5].

operations, often "decide if and when [an employee] can take an unpaid, off-duty break." [Doc. 268-31 at ¶ 13]. But the FAs' practices in facilitating those unpaid breaks appear to have varied. Some clinic employees reported that their FAs scheduled breaks in advance, *see, e.g.*, [Doc. 268-40 at 44:8–16; Doc. 268-32 at 30:25–31:1, 32:1–5, 52:7–12]; *see also* [Doc. 268-11 at ¶ 11], while others represented that their breaks were decided on a day-by-day basis, [Doc. 268-36 at 25:12–18; Doc. 268-54 at 30:12–31:6]. Some employees reported that charge nurses—not FAs—would decide when breaks could be taken, [Doc. 268-35 at 28:19–21; Doc. 268-48 at 61:3–6; Doc. 268-54 at 30:20–25], and other employees reported that they would decide themselves when to take breaks, *see, e.g.*, [Doc. 268-52 at 44:8–45:6; Doc. 268-53 at 32:6–8]. Nurses who worked in home programs, rather than DaVita clinics, would schedule breaks themselves, and they often did so between patient visits. [Doc. 268-51 at 48:18–21; Doc. 268-60 at 66:9–67:10; Doc. 268-95 at 83:20–84:4, 87:18–25]. Some employees were apparently entirely denied any breaks at all. *See, e.g.*, [Doc. 268-94 at 61:9–22, 104:9–15; Doc. 268-68 at 68:23–69:3, 71:12–21].

Meanwhile, because DaVita hospital employees "do not have a consistent daily schedule or set shifts," [Doc. 268-9 at ¶ 7], a hospital RN can clock out for an unpaid meal break only "if another RN relieves them of their duties or if they are between treating patients," [*id.* at ¶ 8]; *see also, e.g.*, [Doc. 268-18 at ¶ 10; Doc. 268-65 at 52:15–53:5; Doc. 268-68 at 68:23–69:3, 71:12–21; Doc. 268-39 at 80:13–81:2]. The timing of hospital employees' breaks was "usually dictated by the RN working" on a particular shift. [Doc. 268-9 at ¶ 9; Doc. 268-34 at 66:4–10; Doc. 268-65 at 52:15–19].

The extent to which employees' breaks were interrupted also varies within the

FLSA Collective. Some reported that their breaks were never or rarely interrupted. *See, e.g.*, [Doc. 268-37 at 37:17–38:2; Doc. 268-96 at 51:15–24; Doc. 268-51 at 63:2–6; Doc. 268-50 at 32:1–3]. Others reported more frequent interruptions of varying degrees. *See, e.g.*, [Doc. 268-80 at 65:9–25 (when fully staffed, 90% of breaks were not interrupted); Doc. 268-35 at 50:17–21 (breaks were interrupted 10–30% of the time); Doc. 268-44 at 84:2–5 (breaks were interrupted 50% of the time); Doc. 268-84 at 58:13–17 (breaks were interrupted 60% of the time); Doc. 268-56 at 61:10–62:6 (two out of every three breaks were interrupted); Doc. 268-88 at 162:20–23 (70% of breaks were interrupted)]. And others still reported that their unpaid breaks were very often or almost always interrupted. [Doc. 268-46 at 97:9–98:13; Doc. 268-51 at 50:5–11; Doc. 268-76 at 45:4–9; Doc. 268-102 at 17:8–11; Doc. 268-104 at 73:1–6].

Some employees reported that the frequency of interruption varied based on location. *See, e.g.*, [Doc. 268-37 at 37:17–38:2; Doc. 268-50 at 31:14–32:3; Doc. 268-51 at 50:5–11, 63:2–6]. One employee who worked at DaVita facilities in Oklahoma and Texas reported that "[e]verywhere was different. Nothing was ever the same at every clinic." [Doc. 268-50 at 34:6–21, 58:2–61:2].

And when the Opt-In Plaintiffs' breaks were interrupted, those interruptions were not addressed in the same way. Some employees who had clocked out for their breaks would clock back in, if possible, if their break was interrupted. [Doc. 268-75 at 61:24–62:8; Doc. 268-87 at 67:10–15]. Some explained that if they were unable to clock out, they would report the missed break to their supervisor and their timesheet would be corrected. [Doc. 268-87 at 67:16–68:9; Doc. 268-44 at 97:11–98:4; Doc. 268-97 at 55:15–57:17; Doc. 268-79 at 62:15–63:19]. A number of Opt-Ins reported that they did

not always ask their supervisor to fix their timesheets, [Doc. 268-53 at 27:4–28:4; Doc. 268-93 at 52:3–23; Doc. 268-95 at 68:16–69:15], and others never asked for such corrections, [Doc. 268-48 at 50:9–22; Doc. 268-84 at 60:1–61:10, 91:1–5; Doc. 268-35 at 56:25–57:9; Doc. 268-73 at 93:12–94:9].

Considering all of this evidence together, the Court finds that this factor weighs in favor of decertification.  The Opt-In Plaintiffs' testimony reflects the absence of any universal practice or policy dictating how unpaid breaks are scheduled, initiated, and taken.  Indeed, the circumstances surrounding the individual Opt-In Plaintiffs' unpaid breaks varied widely, and sometimes on a day-to-day basis, based on location, staffing, patient emergencies, and individual supervisor and employee discretion.  *See Camilotes*, 286 F.R.D. at 349–50 (concluding that the plaintiffs had not established a system-wide practice of failing to provide uninterrupted breaks because the evidence "demonstrat[ed] that departments use[d] varying mechanisms to relieve nurses from duty so that they [could] take their meal breaks"); *Roby v. Lincoln Elec. Co.*, No. 1:18-cv-00006, 2021 WL 722680, at *4 (N.D. Ohio Feb. 24, 2021) (decertifying collective where the plaintiffs' "meal habits var[ied] widely depending on an employee's plant, their location within that plant, and their department's meal break rules").  Nor does the testimony demonstrate any common practice with respect to how—or even if—DaVita employees reported their interrupted breaks to their supervisors.  That the over 1,300 Opt-Ins were supervised by 820 different managers "exponentially compounds the differences and individualized experiences that go to whether there was a violation of the law, rather than creating consistency." *Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 2:10-cv-00948-DWA, 2011 WL 6372852, at *5 (W.D. Pa. Dec. 20, 2011).

The frequency of interruptions during employees' unpaid breaks also varies widely among the FLSA Collective members.  Reports of interruptions ranged from isolated to constant, [Doc. 268-37 at 37:17–38:2; Doc. 268-46 at 97:9–98:13], and some employees even reported facility-by-facility differences in the frequency that their breaks were interrupted, [Doc. 268-37 at 37:17–38:2; Doc. 268-50 at 31:14–32:3; Doc. 268-51 at 50:5–11, 63:2–6]; *see also Camilotes*, 286 F.R.D. at 349 (emphasizing differing rates of missed meal periods in decertification order); *Camesi v. Univ. of Pittsburgh Med. Ctr.*, No. 3:09-cv-00085-CB, 2011 WL 6372873, at *7–8 (W.D. Pa. Dec. 20, 2011) (noting disparities in number of breaks missed or interrupted when concluding that first factor in analysis favored decertification).  Simply put, the Opt-Ins' testimony reveals fairly broad disparities in their employment settings, at least with respect to the alleged facts giving rise to their FLSA claims, and determining whether each Opt-In has a viable claim will "require[] a detailed, fact-specific inquiry" that renders collective treatment inappropriate.  *Camilotes*, 286 F.R.D. at 346.

These significant factual differences cut against Plaintiff's argument that the FLSA Collective members are similarly situated since they all experienced the same FLSA violation—their unpaid breaks were interrupted, missed, or subject to interruption—because DaVita required them to remain available during unpaid breaks.  *See* [Doc. 277 at 25–26].  In a very broad sense, Plaintiff may be correct that (assuming each claim is meritorious) DaVita violated the FLSA in *generally* the same way as to each FLSA Collective member by failing to pay overtime wages.  But as explained above, the evidence adduced in discovery reveals *a lack of* a uniform policy or practice with respect to the management of or compensation for unpaid breaks.  *Cf. Camilotes*, 286 F.R.D. at

349–50 (finding that evidence contradicted the plaintiff's claim of a system-wide practice where "departments use[d] varying mechanisms" to permit meal breaks and employees experienced different levels of interruption). In light of the numerous factual differences discussed above, the Opt-In Plaintiffs are not similarly situated in a way that makes collective treatment appropriate—i.e., their claims cannot be adjudicated via common proof. *See White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 374–75 (E.D. Mo. 2014) (decertifying collective where employees across eight different locations were subject to different tipping policies, so there was no "unified plan or policy" governing them all). This factor weighs in favor of decertification.

## II.    Individual Defenses

The Court also considers "the various defenses available to defendant which appear to be individual to each plaintiff." *Thiessen*, 267 F.3d at 1103.

DaVita raises several potential defenses it argues will be individualized to each Opt-In. *See* [Doc. 268 at 44–49]. The Court limits its analysis to two. First, Defendant argues that "[w]hether an Opt-In would even have worked overtime had additional meal breaks been paid is an individualized issue," [*id.* at 46], and the Court agrees. A determination of whether each individual FLSA Collective member was actually deprived of overtime wages will require a fact-specific inquiry into, inter alia, the number of hours the employee worked in a particular week, whether the employee's breaks were interrupted, whether the employee's timesheet was corrected to reflect the interrupted break, and whether the employee was paid overtime wages. Indeed, some Opt-Ins testified that their breaks were rarely interrupted. [Doc. 268-96 at 51:15–24; Doc. 268-51 at 63:2–6]. To defend against liability on this basis, DaVita will necessarily be required to

10

present evidence specific to each individual Opt-In to which the defense applies.  This weighs against collective treatment.  *See Camesi*, 2011 WL 6372873, at *9 ("whether individual plaintiffs actually worked overtime without compensation" was an individualized defense); *Kuznyetsov*, 2011 WL 6372852, at *6 ("[I]t will be necessary to consider whether each Plaintiff . . . worked through a meal break, . . . whether the meal break deduction was cancelled, how it was cancelled, whether that Plaintiff was compensated for the time.").[5]

Second, to succeed on their FLSA claims, the FLSA Collective members will need to prove, among other things, that DaVita "had actual or constructive knowledge of the overtime."  *Boyer v. Celerity Sols. Grp., LLC*, 482 F. Supp. 3d 1122, 1132 (D. Colo. 2020) (quoting *McGrath v. Cent. Masonry Corp.*, 276 F. App'x 797, 799 (10th Cir. 2008)).  The Opt-In Plaintiffs' deposition testimony varies widely; some employees always reported interrupted breaks to their supervisors, others did so only part of the time, and others never did.  *See, e.g.*, [Doc. 268-87 at 67:16–68:9; Doc. 268-53 at 27:4–28:4; Doc. 268-48 at 50:9–22].  DaVita's lack-of-knowledge defense will necessarily require an

---

[5] Mr. Bowling argues that this "overtime entitlement" defense "concerns a damages issue, which . . . is not a bar to proceed collectively."  [Doc. 277 at 41].  The Court is respectfully unpersuaded by this argument.  Whether an employee worked a sufficient number of hours to qualify for overtime pay goes to whether there was an FLSA violation at all—not that employee's alleged damages.  *See Boyer v. Celerity Sols. Grp., LLC*, 482 F. Supp. 3d 1122, 1132 (D. Colo. 2020) ("To prevail on a claim under 29 U.S.C. § 207(a)(1), a plaintiff-employee must show 'that he actually worked overtime in an amount that can be established by justifiable and reasonable inference.'" (quoting *McGrath v. Cent. Masonry Corp.*, 276 F. App'x 797, 799 (10th Cir. 2008)).  Mr. Bowling also argues that "overtime entitlement is as simple as reviewing pay records to determine the number of hours worked."  [Doc. 277 at 41].  This argument ignores the numerous factual disparities discussed above with respect to whether employees reported their interrupted breaks to their supervisors and whether their timesheets were corrected.  While some Opt-Ins may be able to simply rely on time and pay records, the Court cannot conclude that the same is true for the entire FLSA Collective.

11

individualized inquiry specific to each Opt-In, their supervisor(s), and the circumstances surrounding their overtime work. *See Camilotes*, 286 F.R.D. at 352 ("[D]etermining what supervisors may have been aware of nurses working through meals without compensation will require a fact-specific inquiry based on the specific working conditions each Plaintiff encountered."); *Desilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 27 F. Supp. 3d 313, 325 (E.D.N.Y. 2014) (defense regarding employer's knowledge was individual to each plaintiff or group of plaintiffs); *Kuznyetsov*, 2011 WL 6372852, at *6 (defense was "inherently individualized" where record evidence suggested that the 312 supervisors' "individual knowledge varie[d] because there was no uniform implementation of" policy to cancel meal break deductions). Because these defenses are highly individualized, this factor weighs in favor of decertification.

## III.    Fairness and Procedural Considerations

Finally, the Court considers whether fairness and procedural considerations weigh in favor of or against decertification. *Thiessen*, 267 F.3d at 1103. "The FLSA's collective action has an important remedial purpose:  (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Levine*, 2023 WL 3648684, at *11 (quotation omitted). "This purpose erodes, however, when the collective action would devolve into numerous mini-trials, causing the jury to evaluate testimony from countless witnesses and other evidence that is unique to particular Plaintiffs." *Id.* (quotation omitted).

Mr. Bowling argues that a collective trial "would not be unmanageable because [the FLSA Collective's] claims are subject to common proof through DaVita's uniform

12

policy documents, the common pay and time records applicable to each direct care employee," the "representative testimony of Plaintiffs," and "informal discovery responses of each of the Plaintiffs in this case." [Doc. 277 at 51]. The Court respectfully disagrees. Based on the numerous factual differences in the FLSA Collective members' employment circumstances and DaVita's potential defenses, the FLSA Collective's claims cannot be adjudicated through common proof. Moreover, while Plaintiff insists that a collective trial will be manageable, he does not present a specific trial plan—for example, Plaintiff does not identify which Opt-Ins would present "representative testimony" or explain how that testimony would sufficiently reflect each Opt-In's experiences, given the wide variety in the frequency and circumstances of employees' interrupted breaks. *See* [Doc. 277]; *see also Camilotes*, 286 F.R.D. at 354 ("Plaintiffs' 'representative' testimony in this case would not, in fact, be representative of the class as a whole because of the myriad of factual differences surrounding whether, when, and under what circumstances Plaintiffs took meal breaks and reported missed meal breaks."); *Camesi*, 2011 WL 6372873, at *9 ("There are far too many individualized inquiries to be addressed through representative testimony, bifurcation and sub-classifications, and factor (3) favors decertification.").

The Court recognizes the savings in litigation costs for the individual Opt-In Plaintiffs that collective treatment may provide. *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (recognizing that collective action may "lower individual costs to vindicate rights by the pooling of resources"). But the Court must "balance the reduced litigation costs to individual Plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability and judicial efficiency." *Camesi*, 2011 WL 6372873, at *9. Proceeding with one collective trial would

require an immense number of mini-trials involving each Opt-In Plaintiffs' particular and individualized circumstances.  With over 1,300 Opt-Ins present in the case, the scales tip against collective action.

In sum, all three *Theissen* factors weigh in favor of decertification, and the Motion to Decertify is **GRANTED**.

## IV.    Next Steps After Decertification

If a court determines that opt-in plaintiffs are not similarly situated, then "the court decertifies the class, the opt-in plaintiffs are dismissed without prejudice, and the original plaintiff proceeds to trial on his individual claims."  *Esparsen v. Ridley's Fam. Mkts., Inc.*, No. 18-cv-01556-RM-GPG, 2022 WL 1092136, at *1 (D. Colo. Apr. 12, 2022) (citing *Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1094 (D. Kan. 2012)). Here, Mr. Bowling requests that, if the FLSA Collective is decertified, the Court "either toll [the Opt-In] Plaintiffs' claims for a period of sixty (60) days or stay the entry of its order for a period of sixty (60) days to permit [the Opt-In] Plaintiffs' counsel to coordinate refiling of [the Opt-In] Plaintiffs' claims."  [Doc. 277 at 52].  DaVita does not respond to this argument.  [Doc. 281].

The Court will grant Plaintiff's request.[6]  "Courts routinely apply equitable tolling to FLSA claims, . . . including by tolling the statute of limitations in FLSA collective actions that have been decertified."  *Ayers v. GKN Driveline N. Am., Inc.*, No. 1:23-cv-00581, 2024 WL 691385, at *4 (M.D.N.C. Feb. 20, 2024) (cleaned up) (collecting cases).  Due to

---

[6] The Court would not typically grant a request for relief that is included in a response brief.  *See* D.C.COLO.LCivR 7.1(d) ("A motion shall not be included in a response or reply to the original motion.  A motion shall be filed as a separate document.").  However, to ensure effective tolling for all Opt-In Plaintiffs, the Court will overlook this procedural error.

the number of Opt-In Plaintiffs in this case and the differing factual circumstances present for each Opt-In, the Court will equitably toll the dismissed Opt-In Plaintiffs' FLSA claims for 60 days following the issuance of this Order so that each Opt-In may decide whether to proceed individually. *See Scott v. Chipotle Mexican Grill, Inc.*, No. 12-cv-08333-ALC-SN, 2017 WL 1434498, at *1 (S.D.N.Y. Apr. 19, 2017) ("Given the size and geographic scope of the class in this case, the Court finds that tolling is appropriate in order to avoid prejudice to individual plaintiffs who wish to file their claims."); *McEarchen v. Urb. Outfitters, Inc.*, No. 13-cv-03569-RRM-JO, 2017 WL 3912345, at *2 (E.D.N.Y. Sept. 6, 2017) ("In light of the complexity of the case, and in order to avoid prejudice to the opt-in plaintiffs, the toll is granted.").

## V.    Motions to Exclude

Both Parties disclosed an expert relevant to the decertification stage. Plaintiff retained David Breshears to "review . . . timekeeping-related and payroll-related records as they relate to [the collective] allegations." [Doc. 259-1 at 3]. Similarly, Defendant retained Elaine Reardon to "examine time, payroll and questionnaire data with respect to the allegations Plaintiff raises in" this case. [Doc. 262-1 at 4].

Each side moves to exclude the competing expert's testimony. *See* [Doc. 259; Doc. 262 (the "Motions to Exclude")]. But the Parties' arguments relate only to decertification. *See* [Doc. 259 at 5 ("Mr. Breshears, the expert witness that Plaintiff disclosed for decertification purposes, offers no opinion useful to determining whether this case can survive decertification."); Doc. 262 at 2 ("Defendant intends to present Dr. Reardon's testimony and report in support of its forthcoming motion to decertify. . . . [Dr. Reardon's testimony] is irrelevant to the issue of whether Plaintiffs are similarly situated,

the sole issue before the Court at this stage.")].  Because the Court has ruled on the Motion to Decertify without relying on the experts' opinions, the Court will **DENY** the Motions to Exclude **as moot**.  To the extent either Party wishes to exclude Dr. Reardon's or Mr. Breshears's opinions at a later stage in this litigation, they may file another motion under Rule 702.

### CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)    DaVita Inc.'s Motion to Decertify Fair Labor Standards Act Conditional Collective [Doc. 268] is **GRANTED**;

(2)    The Opt-In Plaintiffs' FLSA claims are **DISMISSED without prejudice**;

(3)    The statute of limitations applicable to the Opt-In Plaintiffs' FLSA claims is **TOLLED** for 60 days following the issuance of this Order;

(4)    Plaintiff James Bowling's FLSA claim **REMAINS**;

(5)    Defendant DaVita Inc.'s Motion to Exclude Expert Testimony of David Breshears Under Rule 702 [Doc. 259] is **DENIED as moot**;

(6)    Plaintiffs' Motion to Strike Witness Testimony and to Exclude Report of Elaine Reardon, Ph.D. and Incorporated Memorandum of Law [Doc. 262] is **DENIED as moot**; and

(7)    No later than **July 31, 2026**, the Parties shall jointly contact the chambers of the Honorable Kathryn A. Starnella to set a Scheduling Conference concerning Phase III discovery.


DATED:  July 17, 2026

BY THE COURT:

_____
Nina Y. Wang
United States District Judge